21CA1734 Peo in Interest of Abeyta 01-20-2022 COLORADO COURT OF APPEALS Court of Appeals No. 21CA1734 Pueblo County District Court No. 21MH151 Honorable Timothy O’Shea, Judge The People of the State of Colorado, Petitioner-Appellee, v. Gregory Thomas Abeyta, Respondent-Appellant. ORDER AFFIRMED Division III Opinion by JUDGE GOMEZ J. Jones and Lipinsky, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced January 20, 2022 Cynthia Mitchell, County Attorney, Kathleen H. Shafer, Special Assistant County Attorney, Pueblo, Colorado, for Petitioner-Appellee Nathan Law P.C., Mary E. Nathan, Fountain, Colorado, for Respondent-
Appellant 
1 ¶ 1 Gregory Thomas Abeyta appeals the district court’s order authorizing mental health personnel at the Colorado Mental Health Institute at Pueblo (CMHIP) to administer medication to him without his consent. We affirm. I. Background ¶ 2 Abeyta has been confined at CMHIP since August 2020, when he was found incompetent to proceed in a criminal case. After he refused certain treatment at CMHIP, the People petitioned the district court for authorization to involuntarily administer three medications: (1) Olanzapine (Zyprexa); (2) Paliperidone (Invega or Invega Sustenna); and (3) Valproic Acid (Depakote). ¶ 3 Dr. Hareesh Pillai, the CMHIP staff psychiatrist who supervises Abeyta’s care and treatment, offered testimony supporting the petition in an affidavit filed with the petition and at an evidentiary hearing before the district court. ¶ 4 Dr. Pillai testified that Abeyta has a mental illness, lacks insight into his mental illness, and is incompetent to effectively participate in decisions affecting his mental health. He said that Abeyta has been diagnosed with bipolar disorder, with symptoms of 
2 paranoia, delusions, disorganized thinking, depression, and suicidal ideation. ¶ 5 Dr. Pillai also explained why Abeyta needs the three proposed medications. Dr. Pillai described the uses, dosages, and potential risks and side effects of the medications, explaining that the Olanzapine and Paliperidone were needed to treat Abeyta’s paranoia and delusions and the Valproic Acid was needed to stabilize his mood. Dr. Pillai explained that Abeyta was currently taking only Olanzapine and Valproic Acid but that Dr. Pillai proposed to administer Paliperidone in place of the Olanzapine, in the hope that the new medication would more effectively treat Abeyta’s paranoia and delusions while causing fewer side effects.
1 Dr. Pillai further explained that, after this transition, he would eliminate the Olanzapine except for use as a backup medication. ¶ 6 According to Dr. Pillai, before receiving the Olanzapine and Valproic Acid on an emergency basis, Abeyta had verbal and 1 At times during the hearing, Dr. Pillai mistakenly referred to the new medication as Haloperidol. At other times, he referred to it by the brand names Invega and Invega Sustenna. It’s clear from the record, including Dr. Pillai’s affidavit attached to the petition, that the new medication is Paliperidone (Invega or Invega Sustenna). 
3 physical outbursts and was aggressive and assaultive toward staff members at CMHIP (including lunging at and attempting to assault staff), but this behavior had significantly declined after Abeyta began receiving the medications. Dr. Pillai opined that without the requested medications Abeyta will likely suffer significant deterioration of his mental condition and will pose a serious risk of harm to himself and others. Finally, he testified that the side effects of the medications are treatable, the failure to medicate would be more harmful than the risks the medications posed, and no less intrusive alternative is available. ¶ 7 Abeyta also testified at the hearing. He denied having a mental illness, being a danger to himself or others, or needing any medications. He did admit, however, that he had yelled at, threatened, and lunged at CMHIP staff and “was a little out of control” before he was given the Olanzapine and Valproic Acid. Yet he said that he had never physically touched anyone. He also said that he would not voluntarily take any medications, and he complained of the side effects of the medications he had been taking, including pain, shaking, nausea, drooling, slurring of words, and a “horrible” taste in his mouth. 
4 ¶ 8 At the end of the hearing, the court granted the petition. The court found that Dr. Pillai had “testified very credibly” and adopted his opinions. The court also expressly found, by clear and convincing evidence, that • Abeyta “is mentally ill,” “has no or limited insight into his mental illness,” and “is incompetent to effectively participate in treatment decisions”; • “the treatment is necessary to both prevent a significant and long-term deterioration in [Abeyta’s] mental condition and prevent the likelihood of [him] causing serious harm to himself or others in [CMHIP]”; • “reasonable efforts have been made to obtain voluntary acceptance of the treatment,” but Abeyta “has repeatedly refused to consent to the treatment”; • “a less intrusive treatment alternative is not available”; and • “the need for the treatment is sufficiently compelling and overrides and [sic] bona fide and legitimate interest [Abeyta] has in refusing the treatment.” The court’s order expires in May 2022. 
5 II. Discussion ¶ 9 Abeyta argues that the district court erred in its application of the law to the facts of this case. We are not persuaded. A. Legal Framework and Standard of Review ¶ 10 To obtain a court order authorizing the involuntary administration of medication, the People must establish the four elements set forth in People v. Medina, 705 P.2d 961, 973 (Colo. 1985). Those elements are (1) that the patient is incompetent to effectively participate in the treatment decision; (2) that treatment by . . . medication is necessary to prevent a significant and likely long-term deterioration in the patient’s mental condition or to prevent the likelihood of the patient’s causing serious harm to himself or others in the institution; (3) that a less intrusive treatment alternative is not available; and (4) that the patient’s need for treatment by . . . medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment. Id.
2 2 When the state seeks to administer medication involuntarily to render a criminal defendant competent to stand trial, courts apply the Supreme Court’s test in Sell v. United States, 539 U.S. 166, 180-81 (2003). But state law tests apply when the state, as here, seeks to administer medication involuntarily for “a different purpose,” including a purpose “related to the individual’s dangerousness, or . . . the individual’s own interests where refusal 
6 ¶ 11 The People bear the burden of proving each of these elements by clear and convincing evidence. Id. Clear and convincing evidence is evidence that “is stronger than a mere ‘preponderance’” and “is highly probable and free from serious or substantial doubt.” People in Interest of R.F., 2019 COA 110, ¶ 16 (quoting Metro Moving & Storage Co. v. Gussert, 914 P.2d 411, 414 (Colo. App. 1995)). The testimony of a physician seeking to administer treatment may itself be sufficient to satisfy the four elements. People in Interest of R.K.L., 2016 COA 84, ¶ 30. ¶ 12 Applying the Medina test involves mixed questions of fact and law. People in Interest of R.C., 2019 COA 99M, ¶ 7. We defer to the district court’s findings of fact if they are supported by the record, but we review the court’s legal conclusions de novo. Id. “The district court, as fact finder, ‘has discretion to determine the credibility of the witnesses; the sufficiency, probative effect, and weight of the evidence; and the inferences and conclusions to be drawn from it.’” Id. (quoting People in Interest of S.M.A.M.A., 172 P.3d 958, 962 (Colo. App. 2007)). to take drugs puts his health gravely at risk.” Id. at 181-82; see also People in Interest of R.F., 2019 COA 110, ¶ 11 n.1. 
7 B. Analysis ¶ 13 The district court found that the People had proved all four Medina elements by clear and convincing evidence. Abeyta challenges the court’s findings on the second, third, and fourth elements. We consider each of these disputed elements in turn. 1. Necessity of the Medication ¶ 14 The second Medina element requires a court to determine “whether the proposed treatment is necessary either to prevent a significant and likely long-term deterioration in the patient’s mental condition or to prevent the likelihood of the patient’s causing serious harm to himself or others in the institution.” Medina, 705 P.2d at 973. This involves consideration of two alternative factors: (1) “the patient’s actual need for the medication” based on the nature and gravity of his illness, the extent to which the medication is essential for effective treatment, the prognosis without the medication, and whether a failure to medicate would be more harmful to the patient than any risks posed by the medication; and (2) “[t]he dangerousness of the patient” to “the physical safety” of himself or others, and specifically “whether [his] mental condition is such that in the absence of the proposed treatment [he] will likely 
8 constitute a continuing and significant threat to the safety of himself or others in the institution.” Id. at 973-74; accord People v. Marquardt, 2016 CO 4, ¶ 18. ¶ 15 Abeyta concedes this element with respect to two of the three medications the district court authorized: Paliperidone and Valproic Acid. But he contends that the third medication, Olanzapine, is not essential to his effective treatment because his treatment plan contemplates replacing it with Paliperidone. He reasons that, because Dr. Pillai indicated that he could be effectively treated with Paliperidone and Valproic Acid alone, with better results and fewer side effects, he “does not actually need Olanzapine.” ¶ 16 To the contrary, Dr. Pillai’s testimony indicates that Olanzapine was still needed for Abeyta’s treatment as of the time of the hearing because Olanzapine was still being used to alleviate his paranoia and delusions, and the potential alternative treatment, Paliperidone, hadn’t yet been tested on him. Thus, the record supports the district court’s finding that this element was satisfied. See People in Interest of C.J.R., 2016 COA 133, ¶ 34 (provider’s testimony about a patient’s need for medication supported finding that this element was satisfied); R.K.L., ¶ 36 (same). 
9 2. No Less Intrusive Alternative ¶ 17 The third Medina element — which considers the availability of less intrusive alternatives — “encompasses not only the gravity of any harmful effects from the proposed treatment but also the existence, feasibility, and efficacy of alternative methods of treating the patient’s condition or of alleviating the danger created by that condition.” Medina, 705 P.2d at 974. An alternative treatment is considered to be less intrusive if it has fewer harmful side effects and is at least as effective at treating the patient’s condition as the proposed treatment. R.C., ¶ 9. ¶ 18 Abeyta argues that administration of Paliperidone and Valproic Acid alone is a less intrusive alternative to administration of all three medications, particularly given Dr. Pillai’s stated belief that Paliperidone would be more effective and cause fewer side effects than Olanzapine. Abeyta also points to Dr. Pillai’s testimony that, after the transition to Paliperidone, Olanzapine would be maintained only as a backup medication. 
10 ¶ 19 In so arguing, Abeyta relies primarily on R.C.
3 In that case, a division of this court held that the People didn’t satisfy the third Medina element as to six backup medications when the patient had already been taking a different medication for ten days, that medication was proving effective, and the treating provider said he would continue the use of that medication and would turn to the backup medications only if they were needed in the future. R.C., ¶¶ 8-16; see also R.K.L., ¶¶ 38, 40 (the People didn’t satisfy this element as to ten backup medications included in a patient’s treatment plan in the event that the medication he was currently taking ceased to be effective or developed intolerable side effects). Critically, the provider in R.C. “did not testify that [the patient] needed to receive the [s]ix [backup] [m]edications at the time of the hearing” or that he would need them in the future. R.C., ¶ 11. ¶ 20 Here, however, the Olanzapine was not purely a backup medication that might never be needed in Abeyta’s treatment. 3 Abeyta also relies on unpublished opinions from this court following People in Interest of R.C., 2019 COA 99M, notwithstanding this court’s policy forbidding the citation of unpublished opinions except in specific circumstances not present here. See Colorado Court of Appeals, Citation Policies, Policy Concerning Citation of Unpublished Opinions (2021), https://perma.cc/5HBK-BGR4. 
11 Rather, as Dr. Pillai testified, it was still in use as of the time of the hearing, was critical to Abeyta’s treatment at that time, and would be eliminated only after — and if — Abeyta successfully transitioned to the new proposed treatment with Paliperidone. Thus, the record supports the district court’s finding that there was, at the time of the hearing, no less intrusive alternative to including Olanzapine with the other two medications. 3. Need for Treatment Overriding Legitimate Reasons to Refuse ¶ 21 In assessing the fourth Medina element — whether the patient’s need for treatment is sufficiently compelling to override any legitimate interest in refusing treatment — a court must consider “whether the patient’s refusal is bona fide and legitimate” and, if it is, “whether the prognosis without treatment is so unfavorable that the patient’s personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient placed in its charge and in protecting the safety of those in the institution.” Medina, 705 P.2d at 974; accord C.J.R., ¶ 40. ¶ 22 Abeyta cites the negative side effects and risks of the medications he had received, including, in particular, the pain he said he suffers for an hour and a half each night that he described 
12 at the hearing as “pure hell.” The district court acknowledged the cited side effects but found that the need for treatment overrode concerns with those side effects. The court also noted that the planned change in medications may alleviate some of the side effects. The record supports these findings. See R.K.L., ¶ 42 (evidence of the severity of the patient’s illness when not treated and the risks if he weren’t medicated supported finding that this element was satisfied). ¶ 23 Accordingly, we conclude that the district court did not err by finding that the People had satisfied all of the Medina elements. III. Conclusion ¶ 24 The order is affirmed. JUDGE J. JONES and JUDGE LIPINSKY concur.